NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL UNION NO. 80, SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, AFL–CIO, Respondent.

No. 19904.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1973.

Decided Feb. 15, 1974.

**1018**

Charles P. Donnelly, N. L. R. B., Washington, D. C., for petitioner; Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul Elkind, Chief, Contempt Litigation, Baruch A. Fellner, Atty., N. L. R. B., Washington, D. C., on brief.

David Y. Klein, Southfield, Mich., for respondent; Sharples, Klein & Gale, Southfield, Mich., on brief.

Before PHILLIPS, Chief Judge, MILLER, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

PHILLIPS, Chief Judge.

On October 9, 1969, this court entered a consent judgment enforcing the order of the National Labor Relations Board against the respondent Union in Board cases 7–CA–6987, 7–CA–6987(2), 7–CA–7066, 7–CB–1841, 7–CB–1841(2), 7–CB–1841(3), 7–CB–1846, 7–CB–1908(1) through 7–CB–1908(5), 7–CB–1918 and 7–CB–1918(2).

The order of the Board which was enforced by this court requires the respondent Union to cease and desist from:

"(a) Causing or attempting to cause . . ., any . . . employer-member of the Sheet Metal Employers' Association of Detroit, or any other employer, to discriminate with regard to hire, tenure, or other terms or conditions of employment against . . . any . . . employee, in violation of Section 8(a)(3) of the Act and because such employee is not a member of Local Union No. 80, Sheet Metal Workers' International Association, AFL–CIO.

\* \* \* \* \* \*

"(c) Operating or maintaining a referral or other hiring system which discriminates against non-members or favors members of Local Union No. 80, Sheet Metal Workers' International Association, AFL–CIO.

"(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed by Section 7 of the Act, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized by Section 8(a)(3) of the Act."

Thereafter the Board filed a petition for adjudication in civil contempt, charging that the respondent Union has disobeyed and failed and refused to comply with the consent judgment of this court.

Respondent Union filed an answer denying that it has disobeyed said judgment of enforcement.

Thereafter this court entered an order of reference appointing Honorable Thomas P. Thornton, Senior Judge, United States District Court for the Eastern District of Michigan, as Special Master to hear evidence and report to this court as to whether respondent is in civil contempt for violating, disobeying and failing and refusing to comply with the court's decree.

The Special Master heard evidence and filed a report containing comprehensive findings of fact. The Special Master concluded that the respondent Union has violated and disobeyed the decree of this court by causing or attempting to cause employers to discriminate against employees in violation of §§ 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act. He recommended that this court enter an order adjudging Local 80 in civil contempt and directing that the Union be required to purge itself as prayed in the Board's Second Amended Petition for Adjudication in Civil Contempt. The findings of fact of the Special Master are made an appendix to this opinion.

Upon consideration of the briefs and oral arguments of the parties and the entire record, this court concludes that the findings of fact of the Special Master are supported by substantial evidence and should be approved and confirmed in all respects.

The following order will be entered:

The National Labor Relations Board having filed a petition to adjudge in civil contempt Local 80, Sheet Metal Workers' International Association, AFL–CIO, in that said respondent has failed and refused to comply with the decree of this court dated October 9, 1969; and said respondent having filed an answer denying that it has disobeyed the decree; and Senior United States District Judge Thomas P. Thornton in his capacity as Special Master having made a report recommending that Local 80 be adjudged in civil contempt of this court and that said respondent be required to purge itself thereof;

It is ordered that the findings of fact and conclusions of the Special Master be approved and confirmed in all respects.

It is further ordered that Local 80, Sheet Metal Workers' International Association, AFL–CIO, is hereby adjudged in civil contempt of this court's aforesaid decree.

It is further ordered that the respondent Union, and its officers, representatives, agents, successors and assigns, shall forthwith purge themselves of such contempt by:

(a) Complying fully with and obeying the Board's order as enforced by this Court's consent decree of October 9, 1969.

b) Immediately posting in conspicuous places at Local 80's business offices, including all places where notices to members are customarily posted, for a period of sixty (60) consecutive days, copies of the contempt adjudication and of an appropriate notice in the form to be supplied by the Board signed by an officer of Local 80 which states that Local 80 has been adjudicated in civil contempt of this Court for violating and disobeying, and failing and refusing to comply with this Court's said consent decree, and that Local 80 will undertake forthwith the action ordered in purgation, said notices, together with a copy of the contempt adjudication to be maintained in clearly legible condition throughout such posting period, and insuring that they are not altered, defaced or covered by any other material.

(c) Providing signed copies of said notice for posting by the employers involved herein, and by all the employers who are members of the Sheet Metal Employers' Association of Detroit, as

well as all employers who have exclusive hiring hall arrangements with Local 80, if these employers are willing, in places where notices to employees are customarily posted.

(d) Immediately signing and mailing copies of said notice to James Patton, Robert Petit, Remo Gizzi, Almond Dumas, Paul Kaczmar and Kenneth Maddox and to all employers with whom Local 80 has a signed agreement or for whom Local 80 maintains a hiring hall service.

(e) Making James Patton, Robert Petit, Remo Gizzi, Almond Dumas, Paul Kaczmar and Kenneth Maddox whole for any loss of backpay they may have suffered respectively as a result of the discrimination against them said backpay to be computed by the Board, subject to review by this Court.

(f) Taking the following affirmative action:

(1) Notify in writing, within 15 days of the issuance of this Order, each and every sheet metal contractor within its territorial jurisdiction with whom it does not have an exclusive referral service arrangement, that it is free to solicit, hire and retain employees including sheet metal workers, without clearance or referral from Local 80.

(2) Notify in writing, within 15 days of the issuance of this Order, each and every sheet metal contractor within its territorial jurisdiction with whom it has an exclusive referral service arrangement, that the Union will operate said exclusive referral service in a non-discriminatory manner and in accord with the terms and requirements set forth below.

(3) If in its referral system, the Union applies any criterion for determining the capabilities of persons to perform any job assignment within its jurisdiction, then said criteria shall be posted in a public place at its hall, shall not directly or indirectly inure to the advantage of members over non-members, and shall not directly or indirectly be based upon the prior use of the Union's hiring hall.

(4) Record in permanent, non-loose leaf form, and post the name of each employer from whom a request for employees has been received, the date and time said request was received by the Union, the location of the project for which employees have been requested, and the number of employees requested.

(5) Maintain in non-loose leaf form permanent records of and post the name, address and telephone number of each applicant for referral to employment and the date and time said applicant applied for referral, irrespective of the applicant's membership in Local 80, or lack thereof. Said applications for referral shall be maintained in the order in which they are submitted by said applicants.

(6) Refer applicants to employment when employees are requested by an employer in the order in which said applicants have submitted their applications, irrespective of their membership in Local 80, or lack thereof.

(7) Maintain in non-loose leaf form records of and post all referrals presented to applicants, containing the name of the applicant referred to employment, the name of the employer to whom referral is made and the specific project to which the applicant is being referred, the name or initials of the Union officer authorizing the referral, and the date and time that said applicant was referred to employment.

(8) Maintain in non-loose leaf form permanent records of and post all names of persons referred to employment in specific written or oral requests by name, from employers, and refer any person so requested without regard to membership in Local 80, or the lack thereof.

(9) Require periodic renewal of referrals to employment, if at all, only on a non-discriminatory basis, without regard to membership in Local 80 or lack thereof.

(10) Refer discriminatees James Patton, Robert Petit, Remo Gizzi, Almond Dumas, Paul Kaczmar and Kenneth

Maddox to the next available employment.

(11) Notify in writing within 60 days of the issuance of this Order, all persons whom the Union has referred to employment in the past five years, and inform said persons that they are being considered for eligibility and that they may indicate whether or not they wish to establish their eligibility for referral and employment in the work described in Article I, Section 1 of the collective bargaining agreement between the Union and the Sheet Metal Employers' Association of Detroit.

(12) Notify in writing, within 60 days of the issuance of this Order, each and every sheet metal contractor with whom the Union has an exclusive referral service arrangement that the Union will refer persons to employment without regard to their membership in Local 80 or the lack thereof and in accord with the terms set forth above.

(13) Notify in writing, within 60 days of the issuance of this Order each and every member of Local 80, each and every sheet metal worker referred to in paragraph 12 above, and each and every sheet metal contractor with whom the Union has a contract, that it will not henceforth in any way by action or inaction continue to commit, engage in, induce, encourage, permit or condone any conduct in violation of the underlying consent decree, this order, or the National Labor Relations Act.

(14) Post a copy of the foregoing provisions in a prominent place in the public portion of the Union's offices, and keep said copy for inspection by any person.

(15) Commencing with July 1, 1974, submit to said Regional Director a written report, describing in detail the names of employers making requests for employees, the number of employees so requested, the names and number of persons applying for referral and the names and number of applicants actually referred to employment. Reports shall thereafter be filed every three months, containing the same information for that three month period, for a period of two years from July 1, 1974.

(g) Preserving and upon request, making available to the Board and its agents for examination and reproduction all records in its possession, custody or control which may be necessary or helpful to analyze, compute and determine the amounts of backpay due to employees under the terms of the Court's order.

(h) Filing separate sworn statements with the Regional Director in writing within 10 days after the entry of the adjudication and again at the termination of the posting period showing what steps have been taken by Local 80 to comply with the Court's direction and submitting to said Regional Director copies of the letters described in subparagraphs (f)1, 2, 12, 13 and 14, with lists of all persons to whom said lists have been mailed.

(i) Paying to petitioner, as court costs, reasonable counsel fees and all costs and expenditures incurred in the investigation, preparation, presentation, and final disposition of this proceeding to adjudge Local 80 in civil contempt.

In order to insure compliance with the foregoing provisions, it is further ordered that upon the failure of the respondent Union to purge itself of contempt as herein provided, this court shall impose a compliance fine of $5,000.00 on the respondent Union and a further compliance fine of $100.00 per day so long as such noncompliance continues. N.L.R.B. v. United Mine Workers, 393 F.2d 265 (6th Cir. 1968); N.L.R.B. v. Lynair, Inc., 380 F.2d 286 (6th Cir. 1967). The court will deal further with the matter by such other means as the court shall then determine, including the issuance of body attachment upon any officer, representative or agent responsible for such noncompliance. *See* N.L.R.B. v. Interurban Gas Corp. and Robert M. Hemphill, 401 F.2d 745 (6th Cir. 1968).

## APPENDIX

### Findings of Fact

1. On October 9, 1969, this Court entered a consent decree enforcing an unreported Board order dated September 10, 1969, against Local 80, its officers, representatives and agents. The Board's order, as enforced, requires Respondent to cease and desist from, *inter alia:*

(a) Causing or attempting to cause . . ., any . . . employer-member of the Sheet Metal Employers' Association of Detroit, or any other employer, to discriminate with regard to hire, tenure, or other terms or conditions of employment against . . . any . . . employee, in violation of Section 8(a)(3) of the Act and because such employee is not a member of Local Union No. 80, Sheet Metal Workers' International Association, AFL–CIO.

\* \* \* \* \* \*

(c) Operating or maintaining a referral or other hiring system which discriminates against non-members or favors members of Local Union No. 80, Sheet Metal Workers' International Association, AFL–CIO.

(d) In any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed by Section 7 of the Act, except to the extent that such rights may be affected by an agreement requiring membership in a labor organization as a condition of employment, as authorized by Section 8(a)(3) of the Act.

(Pet. I, Pre-Trial Tr. 5).

2. The Court's consent decree has been in full force and effect since its entry, and, at all times material herein, Local 80, its officers, representatives and agents have had notice and actual knowledge of the terms thereof (Pet. II, Ans. 2).

3. At all times material herein, the Sheet Metal Employers' Association of Detroit (hereinafter referred to as "the Association"), a non-profit Michigan corporation, has been a grouping of employers engaged in the manufacture, fabrication, assembly, handling, erection, installation, dismantling, reconditioning, adjustment, alteration, repairing, and servicing of nonferrous sheet metal materials in the metropolitan Detroit area of the State of Michigan. The Association has bargained collectively with Local 80 on behalf of its employer-members, with respect to the hours, wages, rates of pay and conditions of employment of certain categories of sheet metal employees by its members, and has negotiated and executed collective-bargaining agreements with the Union (Pet. III, Ans. 3).

4. At all times material herein, the Union has had and abided by and continues to have and abide by, an unwritten understanding, practice and agreement with the Association, its employer-members, and all other employers with whom the Union maintains a collective bargaining agreement, including the employers named in subsequent findings of fact, that written clearance, in the form of an assignment or referral slip, must be acquired from Local 80's hiring hall by member and non-member alike before they are permitted to work within Local 80's jurisdiction (Inter. 1(a) and (c), Ans. to Inter. 1(a) and (c), Tr. 12–13, 17–19, 20–21).

5. At all times material herein, Local 80, in the operation of its hiring hall, has maintained and continues to maintain at its office a list of applicants for referral and employment, commonly referred to as an "out-of-work list", from which the Union refers said applicants to employers for employment as sheet metal workers (Pet. V. A, Inter. 5(a), Ans. to inter. 5(a)).

6. At all times material herein, Local 80 has denied and continues to deny to sheet metal workers who are not members of Local 80, the right to be placed on the "out-of-work list" when they are seeking employment within its territorial jurisidiction (Pet. V. B, Inter. 5(b), Ans. to Inter. 5(b), Tr. 21–22, 23, 255).

By restricting its "out-of-work list" only to members, Local 80 operates its hiring hall for the benefit of members and makes no attempt to afford employment opportunities to non-members through this source (Tr. 33–34).

7. At all times material herein, Local 80 has refused and continues to refuse to refer or clear non-member sheet metal workers for employment unless and until they have first solicited their own jobs, obtained a written request for referral, commonly referred to as a "work request letter", from a prospective employer, and submitted such written request to the Union for its approval. Members of Local 80 are exempt from this requirement as a condition of clearance or referral to a prospective employer (Pet. V. C and D, Ans. 8, Tr. 11–12, 242).

8. At all times material herein, sheet metal workers who are members of Locals of the Sheet Metal Workers' International Association other than Local 80, commonly referred to as "travelers", have been and continue to be forbidden to solicit their own jobs within Local 80's jurisdiction until they have first registered with and been cleared by Local 80 (Inter. 7, Ans. to Inter. 7).

9. At all times material herein, non-member sheet metal workers have been and continue to be required by Local 80 to renew, on a periodic basis, their referral or assignment slips in order to retain their employment while members need obtain new referral slips from Local 80 only when they change jobs (Inter. 8, 10(a), Ans. to Inter. 8, 10(a)).

10. As shown in the subsidiary findings below, Local 80, in the operation of its hiring hall, has discriminatorily failed and refused to refer non-members James Patton and Robert Petit to sheet metal jobs for which they have been specifically requested by their prospective employer and from which they had not been preempted by any other applicant for employment.

A. During the latter half of 1969, Virgil Firebaugh, vice-president of Firebaugh and Reynolds Roofing Co. (hereinafter referred to as "Firebaugh and Reynolds"), a member of the aforesaid Association, repeatedly requested Local 80 to refer sheet metal workers for employment (Tr. 81–82). When these requests went unfilled, said Virgil Firebaugh informed the Union by letter dated November 25, 1969, that he was prepared to hire men off the street and to send them to the Union to obtain the appropriate referral slips (Tr. 82–83, P.X. 5).

B. On December 8, 1969, non-members Patton and Petit, who had previously worked for Firebaugh and Reynolds and who were qualified to perform sheet metal work, solicited employment from Virgil Firebaugh (Tr. 83–85, 88, 104–105, 136–137). Since work was available because the Union had failed to fill the employer's requests, Firebaugh offered them employment contingent upon their obtaining the appropriate clearance from the Union (Tr. 84). Accordingly, Firebaugh gave each of them a work request letter which they were to submit to the Union in return for assignment slips (Tr. 85–87, P.X. 6, 7).

C. On December 8, 1969, Patton and Petit appeared at the Union's hiring hall and sought referral slips to Firebaugh and Reynolds (Tr. 104–106). While Petit stood by, Patton submitted his work assignment letter to a secretary, who in turn, presented it to a Union business agent, Joseph Rivard (Tr. 105). Rivard then asked Patton what the latter wanted him to do with the letter, whereupon Patton asked for a work assignment (Tr. 106). Rivard replied, "Well, go to work if he wants to hire you" (Ibid.). Thereupon, Patton asserted, "Well, you know I can't go to work without an assignment", to which Rivard responded with laughter, turned his back and ended the conversation without issuing assignment slips to Patton or Petit (Ibid.).

D. Subsequent to the Union's refusal to clear and refer Patton and Petit, Local 80 cleared one Barry Fijal, a member of the Union, for employment with Firebaugh and Reynolds (Tr. 204).

E.  On the afternoon of December 8, 1969, Patton and Petit filed charges with the National Labor Relations Board, alleging that Local 80 had violated Section 8(b)(1)(A) and (2) of the Act by discriminatorily refusing to refer them to available jobs with Firebaugh and Reynolds (Tr. 109–110).  By letters dated December 15, 1969, David Klein, attorney for Local 80, informed Firebaugh and Reynolds, Patton and Petit that Local 80 had "no objection" to their being employed by Firebaugh and Reynolds if the proper work request letters were submitted (P.X. 8, 10).  Thereafter, Patton and Petit again presented their letters to the Union, were issued referral slips and were hired by Firebaugh and Reynolds some two or three weeks after they were initially refused permits (Tr. 89–90).

11.  As shown in the subsidiary findings below, Local 80 discriminatorily and arbitrarily failed and refused to renew the work assignment of James Patton, thereby causing Firebaugh and Reynolds to lay him off and to discriminate against him with regard to his tenure of employment.

A.  On April 16, 1970, John Girolamo, a Business Agent for respondent Union, in the course of his duties, visited one of Firebaugh and Reynolds' job sites where four sheet metal workers were employed, three of whom were union members and the fourth was James Patton, who was continuing to work under an assignment slip which in accordance with the discriminatory practice described in "9" above, had to be renewed monthly.  (Tr. 150–151, 152, 116, 118, 134–135, P.X. 11).  Girolamo informed Hillary Johnston, the job foreman, that since Local 80 men were out of work, the Union was not renewing "these boys' assignments to continue work" (Tr. 150).  Later that day, Johnston informed Patton that he had some "bad news", that the Union was no longer renewing work permits and that Johnston would have to lay Patton off when his expired within the following week even though Patton was a good worker and Firebaugh and Reynolds needed men (Tr. 117, 151, 152).

B.  On April 22, one day before his work assignment was to expire, Patton requested a renewal from Girolamo at the Union Hall (Tr. 118–119, P.X. 11).  Girolamo refused, stating that the Union's Executive Board had ordered him not to renew any assignments because there were many journeymen who were out of work (Tr. 119).  After Patton was laid off on the following day, he filed amended charges with the National Labor Relations Board on April 30, 1970 (Tr. 121–122).  Thereupon, within two weeks, Patton received another letter from the Union's attorney, David Klein, stating the Union's willingness to issue Patton the appropriate credentials (P.X. 12).  Thereafter, Patton presented Klein's letter and another request letter from Firebaugh and Reynolds to Local 80, received a new assignment from the Union and returned to work for Firebaugh and Reynolds (Tr. 123–124).

C.  In June, 1970, Patton was laid off because of lack of work (Tr. 125).  Thereafter, in August, Union Business Agent Rivard informed Patton by telephone that a job was available for him (Ibid.).  By the time Patton arrived at the Union Hall to pick up his assignment, Rivard declined to issue it to him, stating that, in the meantime, a couple of journeymen had sought the job and were referred out in preference to Patton (Ibid.).  Subsequently, in September or October of 1970, Virgil Firebaugh telephoned Rivard and requested permission from the Union to reemploy Patton and Petit on a large job which was undermanned (Tr. 92).  Rivard stated that he would prefer that Firebaugh would not send Patton and Petit to the Union hall for permits "because of previous problems that the Union, these two persons had had" (Ibid.).  Rivard added that he had "card-carrying members" available in the hall, who were eventually sent in preference to Patton and Petit, to fill Firebaugh's request for men (Tr 92–93).

12. As shown in the subsidiary findings below, Local 80 compelled Gizzi Metal Erector Corp. (hereinafter referred to as "Gizzi Metal"), with whom it had a collective bargaining agreement, to discriminatorily select a traveler, Remo Gizzi, for lay-off and to retain a member of Local 80.

A. On or about April 10, 1970, Gizzi Metal was forced to lay off part of its work force because one of Local 80's members was unwilling to perform his job (Tr. 190–191). Thereupon Gizzi Metal laid off three Local 80 members and retained Remo Gizzi, a traveler from Local 73 who was also qualified to drive a truck and Donald Poyle, a member of Local 80 (Tr. 192–193). Thereafter, Gizzi Metal was fined in the sum of six hours pay, because it had retained an "out-of-town man" in preference to members of Local 80, notwithstanding the fact that the traveler who was retained, Remo Gizzi, was better qualified than those who were laid off and would have been otherwise retained (Tr. 193–197, P.X. 17).

B. On or about April 22, 1970, it was necessary for Gizzi Metal to lay off additional men, whereupon Amadeo Gizzi, president of the Company, telephoned Business Agent Girolamo, and asked him who was to be laid off first (Tr. 197–198). Girolamo answered, "Well, you know the out-of-town men go first . . . ." (Tr. 198). Accordingly, Amadeo Gizzi was forced to lay off his brother, Remo Gizzi, the only "out-of-town man" on his payroll who would have otherwise been retained because of his sheet metal experience and his additional qualifications as a truckdriver (Ibid.).

13. As shown in the subsidiary findings below, Local 80, in the operation of its hiring hall, discriminatorily failed and refused to refer traveler Remo Gizzi to a sheet metal job for which he had been specifically requested by his prospective employer and from which he had not been preempted by any other applicant for employment.

A. After his layoff on April 22, Remo Gizzi attempted to transfer from Local 73 to Local 80 by submitting a transfer card (P.X. 15) to Thomas Crawford, Secretary-Treasurer for Local 80 (Tr. 174–175) [1] Crawford accepted the transfer card and promised to present it to the Union's Executive Board during the month of May (Tr. 176). When Gizzi then asked for an assignment slip, Crawford declined, asserting that "he had about 60 men out of work in Local 80" (Tr. 175).

B. Thereafter, Remo Gizzi obtained a work request letter from his brother, Amadeo, which he submitted to Union Business Agent Al Tibbs on or about April 24 (Tr. 177–178). Tibbs refused to issue Gizzi an assignment slip, echoing Crawford's assertion that the Union had 60 men out of work and further stating: "I can't even put my boys to work. I can't do nothing for you . . . ." (Tr. 178). Despite this assertion, the Union adduced no evidence that Local 80 men had applied for employment to Gizzi Metal before the appearance of Remo Gizzi and therefore took preference over Remo, or, in fact, that any Local 80 men had been referred to Gizzi Metal at all.

C. Subsequently, Remo Gizzi filed a charge with the National Labor Relations Board, alleging that the Union's actions were in violation of Section 8(b)(1)(A) and (2) of the Act (Tr. 179). Shortly thereafter, Gizzi received a telephone call from William Styles, a business agent for Local 80, and was informed that he could pick up his assignment slip on the following morning (Tr. 179–180). On the next day, Gizzi went to the hiring hall, and was given the assignment by Styles who said, "Now you can go to work." Then, with a pat on the back, Styles added, "What about

---

1. Gizzi had previously been informed by a Local 73 business agent that he should have no difficulty in meeting the qualifications set forth in the International's Constitution, and in effectively transferring to Local 80 (Tr. 173).

dropping the charges now, what about those charges?" Gizzi answered that he could not do anything about that now, and, in turn, asked Styles about his transfer to Local 80. Styles answered that that was not his "department" (Tr. 180). Within "a couple of months" after Remo was rehired, Amadeo Gizzi met William Bradfield, the business manager of Local 80, in Local 80's parking lot (Tr. 202–203). During the ensuing conversation, Bradfield asked, "What are you trying to do to me?" (Tr. 203). When Amadeo asked "What am I doing?" Bradfield answered, "Well, talk to Remo, see if he could drop the charges" (Tr. 203).

14. On April 21 and 22, 1971, Local 80 failed and refused to grant a referral or assignment slip to Almond Dumas, a non-member who had been offered a job as a sheet metal worker by Ring Brothers Heating Company (Tr. 161–163). Dumas was denied clearance to this position because of the application of the discriminatory rule requiring non-members to submit a work request letter to the Union before they could receive an assignment slip (see Paragraph 7, *supra*.). Dumas was unable to persuade his prospective employer to issue him a work request letter, a practice with which Ring Brothers had heretofore been unfamiliar (Tr. 164–167).

15. As shown in the subsidiary findings below, Local 80, in the operation of its hiring hall, discriminatorily failed and refused to refer non-members Kenneth Maddox and Paul Kaczmar to sheet metal jobs for which they had been specifically requested by their employer and from which they had not been preempted by any other applicant for employment.

A. During the winter of 1969, Milbrand Maintenance, Inc. (hereinafter referred to as "Milbrand"), a member of the aforesaid Association, was experiencing considerable difficulty in obtaining sheet metal workers through Local 80's hiring hall (Tr. 37–38). This critical shortage of sheet metal workers continued through the month of December, when, on December 29, Milbrand by

James Dixon, president of the Company, wrote to Business Manager Bradfield, "in effect begging for people" (Tr. 42, P.X. 4).

B. Maddox and Kaczmar were roofers in Milbrand's employ who possessed extensive experience and qualifications in the sheet metal trade (Tr. 38, 39, 57). In an effort to obtain their services as sheet metal workers, Ralph Catana, Milbrand's superintendent, furnished them with a copy of a National Labor Relations Board Notice stating that Local 80 could not discriminate in their hiring practices (Tr. 59). Then, in the first week in December, Maddox and Kaczmar, accompanied by Milbrand's Union steward, presented themselves at Local 80's hiring hall in an attempt to obtain referral as sheet metal workers (Tr. 60). First, they submitted the Notice to Business Agent Tibbs who said, "That's nothing, we've got one tacked up over here," as he pointed to the Union's bulletin board, where the same notice was hanging (Tr. 60). Thereupon, the Union steward asked that Maddox and Kaczmar be furnished clearance so that they could do sheet metal work (Tr. 61). Tibbs refused, insisting that he had to take the matter up with Bradfield (Ibid.).

C. On December 10, 1969, Maddox and Kaczmar were given work request letters by Bruce Carty, the vice-president of the Company (Tr. 38–41, P.X. 2, 3). Thereafter, they submitted these letters to Business Agent Tibbs, who, once again refused to issue them the necessary credentials, falsely asserting that this was within Bradfield's exclusive authority (Tr. 63, 65, 253) and that Bradfield was ostensibly unavailable. Maddox and Kaczmar made yet a third visit to the hiring hall, and were again refused referral, with Tibbs falsely stating that Milbrand had not requested any men (Tr. 65–66). Tibbs added that he would not provide Kaczmar and Maddox with a referral so long as any Local 80 members were out of work (Tr. 65).

D. Since Milbrand's urgent need for sheet metal workers remained unfilled

by Local 80 (Tr. 44–45, 50), the employer took the "desperation move" of assigning Kaczmar and Maddox to perform sheet metal work without prior clearance from the Union (Tr. 45). Accordingly, on February 5 or 6, 1970, they openly began to work on sheet metal on a site known as the "McManus Job" (Tr. 66). Thereafter, they were asked for their sheet metal cards by Local 80's steward on the job (Tr. 67). When they could not produce their cards, the steward asked them to leave the job which they refused to do (Ibid.). At the conclusion of their first day's work, Kaczmar and Maddox discovered that the Company truck which was reserved for their use had three flat tires and could not be driven (Tr. 67–68).

E. On the following day, after they had worked for about an hour, Business Agent Rivard appeared on the scene and ordered Kaczmar and Maddox to "Stop right now" (Tr. 68). When they refused, Rivard said, "You guys better stop right now if you ever want to see your wives again" (Tr. 68). Thereupon, Kaczmar asked, "You mean you're telling us to stop work right now, that we can't work", whereupon Rivard replied, "Yes, you'd better believe it if you ever want to see your wives again" (Tr. 68, 69). Maddox then asked, "Are you threatening me?" and Rivard answered, "You're goddam right I'm threatening you" (Tr. 74–75). Maddox and Kaczmar have performed no sheet metal work since their conversation with Rivard (Tr. 69).

F. During the fall of 1971, Virgil Firebaugh, in an attempt to hire additional sheet metal workers, issued a work request letter to Kenneth Maddox (Tr. 69, 96). Thereafter, Maddox submitted the letter to Business Agent Tibbs and requested referral to employment with Firebaugh and Reynolds (Tr. 69–70). Tibbs refused to grant Maddox an assignment slip, stating, "I'm sorry but there isn't much I can do. We've got a hundred to two hundred men out of work" (Tr. 70). Therefore, Maddox was not employed by Firebaugh and

Reynolds. The Union adduced no evidence to show that any member's claims to employment were paramount to Maddox's, nor that any Local 80 man was sent to Firebaugh and Reynolds in Maddox's stead.

16. Local 80's hiring hall is the largest source of sheet metal workers within its jurisdiction (Tr. 348–349, P.X. 1, p. 76).

17. By requiring all sheet metal workers to obtain written clearance from Local 80 before they are permitted to work within its jurisdiction, *supra*, paragraph 4, Local 80 has established an exclusive hiring hall, or an exclusive referral service.

18. As shown in the subsidiary findings below, and in accordance with the Court's statement at the conclusion of the hearing, that the admissions of Respondent's witness Styles, established "that there was discrimination" (Tr. 356), Local 80, in the day-to-day operation of its hiring hall, has engaged in a consistent and uninterrupted pattern of discrimination and causing employers to discriminate against non-members and travelers, and restraining them in the exercise of their Section 7 rights, and causing or attempting to cause employers to discriminate against them. More specifically,

A. By reserving the "out of work list" for the exclusive use of its members, *supra*, paragraphs 5 and 6, Local 80 has excluded non-members and travelers from one of the major functions and benefits of the hall, and has thereby discriminated against them.

B. By requiring only non-members to obtain "work request letters" from their prospective employers before the hiring hall will issue them an assignment slip, *supra*, paragraph 7, Local 80 restricted their right to obtain employment and has thereby discriminated against them.

C. By maintaining a rule forbidding members of sister locals from soliciting work on their own, coupled with their exclusion from the "out of work list", *supra*, paragraph 8, Local 80 has severe-

ly limited the employment opportunities of travelers and thereby discriminated against them.

D. By requiring only non-members to regularly and periodically renew their assignment slips, *supra,* paragraph 9, Local 80 has encumbered the right of non-members to retain employment, thereby discriminating against them.

19. As shown in the subsidiary findings below, Local 80, in the operation of its hiring hall, has repeatedly discriminated against non-members James Patton, Robert Petit, Kenneth Maddox, Paul Kaczmar and Almond Dumas and traveler Remo Gizzi by refusing to refer them to employment and by causing their discharge because they were not members of the Union despite the fact that they were qualified to perform sheet metal work in the eyes of their employers and despite the fact that they were not preempted by any other applicants for employment. More specifically,

A. Local 80 failed and refused to issue non-members James Patton and Robert Petit referral or assignment slips allowing them to perform sheet metal work although they had complied with the Union's discriminatory work request letter rule and notwithstanding the fact that they were qualified to perform sheet metal work and that they were not preempted by any other applicants for employment.

B. Local 80 failed and refused to abide by its own discriminatory permit renewal rule by failing and refusing to renew the work assignment of James Patton thereby causing his lay off and the corresponding retention of Local 80 members in preference to non-members.

C. Local 80 failed and refused to refer James Patton and Robert Petit when they were specifically requested by their prospective employer because they had filed unfair labor practices against the Union.

D. Local 80 caused the discriminatory lay off of traveler Remo Gizzi by fining his employer for retaining him in preference to a Local 80 member and by advising the employer that when the occasion arose, the out-of-town man must be laid off first.

E. Local 80 failed and refused to issue Remo Gizzi a referral or assignment slip allowing him to be reemployed although he complied with the Union's discriminatory work request letter rule and notwithstanding the fact that he was qualified to perform sheet metal work and was not preempted by any other applicant for employment.

F. Local 80 failed and refused to issue non-member Almond Dumas a referral or assignment slip clearing him for sheet metal work, notwithstanding that his prospective employer was ready and willing to hire him as a qualified sheet metal worker and notwithstanding that he was not preempted by any other applicant for employment.

G. Local 80 repeatedly failed and refused to issue non-members Kenneth Maddox and Paul Kaczmar referral or assignment slips, thus preventing them from performing sheet metal work although they had complied with the Union's discriminatory work request letter rule and notwithstanding the fact that they were not preempted by any other applicants for employment.

H. Local 80 underscored its arbitrary, capricious and discriminatory conduct against Kaczmar and Maddox with threats of bodily violence.

### Conclusions of Law

By the conduct set forth in findings 5 through 15 and 18–19, Respondent has violated and disobeyed the decree of the Court of Appeals, by restraining and coercing employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act, and by causing or attempting to cause employers to discriminate against employees in violation of Sections 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act respectively, and, for such disobedience, it is recommended by the Special Master that the Court enter an order adjudging Local 80, its officers, represent-

atives and agents, in civil contempt, and directing that the Union be required to purge itself as prayed in the Board's Second Amended Petition for Adjudication in Civil Contempt.